# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

MIKE H. SAMPLE,

     *Plaintiff*,

v.                     CASE NO. 12-CV-12018

COMMISSIONER OF         DISTRICT JUDGE LAWRENCE P. ZATKOFF
SOCIAL SECURITY,       MAGISTRATE JUDGE CHARLES E. BINDER

     *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), the recently amended provisions of Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Commissioner's decision denying Plaintiff's claim for a period of disability and disability insurance benefits. This matter is currently before the court on cross-motions for summary judgment. (Docs. 14, 18, 19.)

Plaintiff was 43 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 9 at 43.) Plaintiff's employment history includes work as modular home setter for eight years, a laborer for five years, and an oil changer for one month. (Tr. at 131.) Plaintiff filed the instant claim on October 8, 2008, alleging that he became unable to work on March 15, 2008. (Tr. at 108.) The claim was denied at the initial administrative stages. (Tr. at 62.) In denying Plaintiff's claim, the Commissioner considered affective disorders and disorders of the back (disco genic and degenerative) as possible bases for disability. (*Id.*) On July 22, 2010, Plaintiff appeared before Administrative Law Judge ("ALJ") Curt Marceillo, who considered the application for benefits *de novo*. (Tr. at 18-38, 39-61.) In a decision dated September 17, 2010, the ALJ found that Plaintiff was not disabled. (Tr. at 33-34.)

Plaintiff requested a review of this decision and the ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on January 30, 2012, when the Appeals Council denied Plaintiff's request for review. (Tr. at 7-12.) On May 4, 2012, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

### B.    Standard of Review

In enacting the social security system, Congress created a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is

multifaceted in that a state agency makes an initial determination which can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making

3

a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting S.S.R. 96-7p, 1996 WL 374186, at \*4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence

without directly addressing in his written decision every piece of evidence submitted by a party");
*Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

Judicial review of the ALJ's decision is direct, "but we play an 'extremely limited' role."
*Simila v. Astrue,* 573 F.3d 503, 513-14 (7th Cir. 2009). "We do not actually review whether [the claimant] is disabled, but whether the Secretary's finding of not disabled is supported by substantial evidence." *Lee v. Sullivan*, 988 F.2d 789, 792 (7th Cir. 1993). Just as "'[n]o trial is perfect,' . . . no administrative hearing or opinion is either[;] thus, in analyzing an ALJ's decision, a reviewing court is to look for 'fatal gaps or contradictions' and not 'nitpick' in search of essentially meaningless missteps." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1965 (N.D. Ill. 2011).

## C.   Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits Program ("DIB") of Title II, 42 U.S.C. §§ 401 *et seq.*, and the Supplemental Security Income Program ("SSI") of Title XVI, 42 U.S.C. §§ 1381 *et seq*. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

5

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [her] impairments and the fact that [she] is precluded from performing [her] past relevant work." *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC [residual functional capacity] and

considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through December 31, 2009, and that he had not engaged in substantial gainful activity during the period from his alleged onset date of March 15, 2008, through his date last insured of December 31, 2009. (Tr. at 20.) At step two, the ALJ found that Plaintiff's degenerative disc disease of the cervical and lumbar spine, carpal tunnel syndrome (status post right carpal tunnel release), obesity, and depression were "severe" within the meaning of the second sequential step. (*Id.*) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 20-23.) At step four, the ALJ found that Plaintiff could not perform any of his past relevant work. (Tr. at 31.) At step five, the ALJ found that Plaintiff could perform a limited range of sedentary work. (Tr. at 23-31.) The ALJ also found that Plaintiff was a younger individual, age 18 to 44, on the date last insured. (Tr. at 32.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 33-34.)

In order to be eligible for disability insurance benefits, a person must become disabled during the period in which he or she has met the statutory special earnings requirements. 42 U.S.C. §§ 416(i)(2)(c); 423(a), (c), (d). "If a clamant is no longer insured for disability insurance benefits at the time [he] files [his] application, [he] is entitled to disability insurance benefits only if [he] was disabled before the date [he] was last insured." *Renfro v. Barnhart*, 30 F. App'x 431, 435 (6th Cir. 2002). Therefore, the ALJ generally only considers evidence from the alleged disability onset date through the date last insured. *King v. Sec'y of Health & Human Servs.*, 896 F.2d 204, 205-06

(6th Cir. 1990). "Evidence of disability obtained after the expiration of insured status is generally of little probative value." *Strong v. Social Sec. Admin.,* 88 F. App'x 841, 845 (6th Cir. 2004). In order for evidence of the plaintiff's condition after the date last insured to be relevant to the disability decision, the evidence "must relate back to the claimant's condition prior to the expiration of her date last insured." *Wirth v. Comm'r of Soc. Sec.*, 87 F. App'x 478, 480 (6th Cir. 2003). If the plaintiff becomes disabled after the loss of insured status, the claim must be denied even though the plaintiff has indeed become disabled. *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990); *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).

Therefore, the relevant time period in this case is the period from Plaintiff's alleged onset date of March 15, 2008, through his date last insured of December 31, 2009. (Tr. at 20.)

### E.   Administrative Record

### 1.   Evidence from March 15, 2008, to December 31, 2009

A review of the relevant medical evidence contained in the administrative record indicates that Plaintiff was injured in a snowmobile accident, during which he was hit by an automobile. (Tr. at 277.) Plaintiff was treated by Brain Copeland, M.D., for back pain. (Tr. at 219-24.) Plaintiff was also treated at Mid-Michigan Hospital from July 14, 2008, to July 17, 2008, for back pain. (Tr. at 230-32.) Although his primary care physician was listed as "Dr. Churbaji at the Sanford Medical Center," the hospital noted "[t]he patient does not have a primary care." (Tr. at 230, 233.) On July 15, 2008, an MRI of the cervical spine showed

> [d]egenerative changes throughout the cervical spine are greatest at the C6-7 level where there is moderate to marked foraminal narrowing bilaterally, greater on the left. Effacement of the theca sac with only mild effacement of the anterior aspect of the cervical cord is present at C6-7 and minimal effacement of the left anterior aspect of the cervical cord is present at C5-6.

(Tr. at 213, 237, 258.) On the same day, an MRI of the lumbar spine revealed that

8

[t]here is a posterolateral disk protrusion on the left at L4-5 with mild effacement of the left anterolateral aspect of the theca sac and altered signal in the annulus indicating annular disruption. There is a thin broad-based disk protrusion posterolaterally on the right at L5-S1 producing mild-to-moderate foraminal narrowing. The remainder of the lumbar spine appears unremarkable.

(Tr. at 215, 238-39, 255-56.) X-rays of Plaintiff's chest were normal (Tr. at 240) and a pre-MRI examination of Plaintiff's orbits was also normal. (Tr. at 242.) A CT scan of Plaintiff's abdomen and pelvis was normal except for "[m]ild bladder wall thickening." (Tr. at 244, 259.)

On August 14, 2008, Dr. Copeland indicated that Plaintiff had a "50 percent limited range of motion of his lumbar spine in all directions. There is no motor or sensory deficit noted. He has intact symmetric reflexes." (Tr. at 220.) Dr. Copeland also stated that Plaintiff's MRI showed "degenerative changes throughout his lumbar and cervical spine, but nothing that would indicate to me that surgery would benefit him. I have referred him to a psychiatrist." (*Id.*)

On September 30, 2008, Plaintiff was referred to physical therapy. (Tr. at 246-48.)

Plaintiff was also treated by Amarish Potnis, M.D., for back and other pain. (Tr. at 249-70, 321-30, 354-55.) Dr. Potnis placed Plaintiff on a "no work status - continue until further notice" in September of 2008. (Tr. at 339.) Plaintiff's strength was consistently noted to be 5/5. (*Id.*) On October 17, 2008, Dr. Potnis recommended a continuation of physical therapy and instructed that Plaintiff was "not to overtake medications, only use as we prescribe." (Tr. at 262-63.)

On October 21, 2008, Plaintiff was evaluated by Jill Freeland, M.S.W. (Tr. at 273-81.) It was noted that Plaintiff's thought processes and thought control were all within normal limits. (Tr. at 274.) Freeland diagnosed depressive disorder. (Tr. at 280.)

At the request of Disability Determination Services ("DDS"), Plaintiff was examined by Jennifer Lombardo, Ph.D., on January 29, 2009. (Tr. at 282-88.) Dr. Lombardo also diagnosed depression (major depressive disorder) and stated that "depressive symptoms likely would not

significantly impair his ability to function in a job. On the contrary, if he was physically able to work, the depressive symptoms would likely remit with gainful employment. There appears to be no impairment in his ability to interact appropriately with others." (Tr. at 287-88.)

On February 6, 2009, a Psychiatric Review Technique was completed by Ron Marshall, Ph.D., who diagnosed Plaintiff with affective disorders, i.e., major depressive disorder. (Tr. at 289, 292.) Dr. Marshall concluded that Plaintiff was mildly limited in activities of daily living and in maintaining social functioning, and was moderately limited in maintaining concentration, persistence, or pace. (Tr. at 299.)

A Mental Residual Functional Capacity ("RFC") Assessment completed on February 6, 2009, by Dr. Marshall concluded that Plaintiff was moderately limited in the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain concentration for extended periods, the ability to perform activities within a schedule, the ability to work in coordination with others, and the ability to complete a normal workday and workweek, but was not significantly limited in the ability to sustain an ordinary routine, remember locations and work-like procedures, make simple work-related decisions, understand and remember simple work instructions, and carry out short and simple work instructions. (Tr. at 303-04.) Plaintiff was found to be moderately limited in the ability to interact appropriately with the general public, respond appropriately to changes in the work setting, and travel in unfamiliar places, but was otherwise not significantly limited in social interaction or adaptation. (Tr. at 304.) The assessment concluded that Plaintiff "[r]etains ability to do rote tasks within physical limitations. Able to follow at least simple calculations. May work better with minimal contact with the public. Concentration difficulties preclude complex-tech tasks." (Tr. at 305.)

On February 9, 2009, a physical RFC assessment completed by Jeffrey Forsythe, a single decision maker ("SDM"), concluded that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and was unlimited in his ability to push or pull. (Tr. at 308.) Plaintiff was occasionally limited in his ability to climb and frequently limited in all other postural areas. (Tr. at 309.) There were no manipulative, visual, communicative or environmental limitations established. (Tr. at 310-11.)

Plaintiff was referred by Dr. Potnis to John N. DiBella, M.D., of the Pain Management Center on March 23, 2009. (Tr. at 358.) Dr. DiBella diagnosed "[d]egenerative changes in the lumbar spine with probable radiculopathy at L5-S1 on the right." (Tr. at 362.) Dr. DiBella noted that Plaintiff "did undergo the first two in a series of [epidural steroid injections] noting minimal relief of pain. It is for this reason perhaps that he canceled his remaining appointments . . . ." (Tr. at 358.)

On April 30, 2009, x-rays of the sacroiliac joints were unremarkable on the right and showed "[m]ild degenerative change" on the "left sacroiliac joint." (Tr. at 332.)

Plaintiff received chiropractic treatment in August 2009. (Tr. at 316-19.)

On August 31, 2009, Dr. Potnis indicated that Plaintiff's upper and lower extremity strength was 5/5, his "[g]ait is stable and comfortable without assistive device[,] his "[s]traight leg, Spurling and Hoffman negative," his "[l]umbar range to 70 degrees of flexion, 10 to 15 degrees of extension with some myofascial back tenderness[,]" his "[h]ip range of motion full and pain free" and his "[c]ervical range with some myofascial discomfort at end range." (Tr. at 328.)

On November 24, 2009, Dr. Potnis performed electrodiagnostic studies which revealed right carpal tunnel syndrome but which also showed "no findings to suggest acute left lumbosacral

radiculopathy" and there were "no features of myopathy, flexopathy, cervical radiculopathy in the upper right extremity" and there were "[n]o electrodiagnostic features of left myopathy, plexopathy or focal neuropathy in the left lower extremity." (Tr. at 324.)

## 2.    Evidence after December 31, 2009

On July 20, 2010, Dr. Jilhewar stated his disagreement with the DDS physician's 2009 assessment that Plaintiff was able to perform light work and instead opined that "the physical RFC is sedentary," noting also that Plaintiff did not meet Listing 1.04. (Tr. at 383.)

On February 10, 2010, Dr. Potnis completed a form entitled Lumbar Spine Residual Functional Capacity. (Tr. at 341-44.) Dr. Potnis concluded that Plaintiff had a reduced range of motion in the cervical and lumbar areas, had tenderness, muscle spasm, and impaired sleep, but did not have an abnormal gait, sensory loss, reflex changes, crepitus, muscle atrophy, or muscle weakness. (Tr. at 342.) Dr. Potnis indicated that Plaintiff suffered from constant pain and that his experience of pain would therefore "[c]onstantly" interfere with the attention and concentration needed to perform even simple work tasks. (Tr. at 342.) Dr. Potnis indicated that Plaintiff could walk one city block, sit for ten minutes at a time, stand for ten minutes at a time, and sit for two hours in an eight-hour workday, and stand or walk for two hours in an eight-hour workday. (Tr. at 342-43.) Dr. Potnis also concluded that Plaintiff must walk every ten minutes for ten minutes at a time and that he needs to shift positions at will from sitting, standing or walking. (Tr. at 343.) Dr. Potnis noted that Plaintiff does not require an assistive device to walk, and that he could occasionally lift 10 pounds, should never be required to twist, bend, etc., and should only be required to use finger manipulations 10% of the time. (Tr. at 343-44.) Dr. Potnis concluded that Plaintiff's symptoms would result in his absence more than four days per month and that his "course [of treatment] is not compatible with work - No work status recommended." (Tr. at 344.)

On February 11, 2010, Plaintiff underwent right hand carpal tunnel release performed by John Murphy, D.O. (Tr. at 366-67.) Dr. Murphy noted that Plaintiff healed well and was "able to flex and extend the wrist without difficulty" and was "able to perform thumb opposition." (Tr. at 365.) By April 2010, Dr. Murphy noted that Plaintiff had "[f]ull range of motion of his wrist" and that his "[s]ensation is intact, pulses positive, compartments supple." (Tr. at 364.)

On March 3, 2010, a Medical Interrogatory was completed by Michael Cremerius, Ph.D. (Tr. at 345-49.) Dr. Cremerius concluded that Plaintiff was mildly restricted in maintaining concentration, persistence, and pace, but was not limited at all as to activities of daily living or maintaining social functioning. (Tr. at 347.) Dr. Cremerius concluded that Plaintiff's impairments did not meet or equal a Listing. (Tr. at 349.)

On July 20, 2010, Ashok Jilhewar completed a Medical Source Statement. (Tr. at 373-78.) He concluded that Plaintiff was able to frequently lift and carry ten pounds, sit for two hours, stand and walk for thirty minutes at a time, and sit for eight hours, stand for two hours, and walk for two hours in an eight-hour workday. (Tr. at 373-74.) He also found that Plaintiff could frequently use his hands and feet, frequently climb stairs and ramps, balance, and stoop, but could only occasionally kneel, crouch, and crawl, and should never climb ladders or scaffolds. (Tr. at 375-76.)  Plaintiff was noted as being able to perform all necessary daily activities. (Tr. at 378.)

### 3.    Plaintiff's Testimony

Plaintiff testified that he stopped working in March 2008 because he "just couldn't do it" due to pain in his lower back and neck. (Tr. at 44.) Plaintiff stated that his pain level was "around 6, 6-and-a-half" out of 10, and that his pain was better with Lortab medication. (Tr. at 46.) Plaintiff stated that his carpal tunnel syndrome was "not bad," but that he has nerve damage in

13

three fingers on his right hand, causing pain, burning sensations, and tingling. (Tr. at 47-48.) Plaintiff wore a splint on the right hand at the hearing. (Tr. at 49.) Plaintiff described that on a typical day, he makes breakfast for his daughter, does laundry, makes coffee, watches television, takes a nap, finishes the laundry, does a "few chores around the house[,]" gets the mail, washes dishes, and does some cleaning. (Tr. at 49-50.) Plaintiff also stated that he grocery shops about every two weeks and goes out for dinner and to the movies. (Tr. at 50-51.) Plaintiff stated that he can lift eight to ten pounds, sit for fifteen to twenty minutes at one time, after which he would need to rotate. (Tr. at 51.) Plaintiff also indicated that he can stand for fifteen or twenty-five minutes at a time. (Tr. at 52.) When asked by his attorney, Plaintiff stated that he can alternate for three to four hours, but then needs to recline or lie down for an hour or an hour and a half. (Tr. at 52.) Plaintiff also stated that he can walk about two blocks or the length of his property, which is two acres, before he would need to stop. (Tr. at 53.)

### 4.    Vocational Testimony

The ALJ asked the vocational expert ("VE") to assume someone with Plaintiff's background who

> is capable of performing sedentary work as the regulations define that term with the following additional limitations: capable of standing or walking up to 30 minutes at one time. Can sit within the regulatory definition of sedentary work. Can frequently push and pull and operate foot controls. Could never climb ladders, ropes, or scaffolds. Can frequently balance, stoop, and climb ramps and stairs. Occasional crouching and crawling. Can use the hands frequently. That's for reaching, handling, fingering, feeling. No [INAUDIBLE] exposure to unprotected heights. Limited to simple, routine, and repetitive tasks. The job shouldn't require any significant decision-making and relatively few changes in the work setting.

(Tr. at 56.) The VE responded that such a person would be able to perform the following jobs at the sedentary and unskilled level: 2,500 information clerk, 3,800 machine operator, and 4,900 general office clerk jobs in the lower peninsula of Michigan. (Tr. at 57.) The ALJ then asked the

VE to assume the same conditions and to add a requirement that the person be given a sit-stand option every twenty to thirty minutes, and the VE responded that there would be no reduction in jobs. (Tr. at 57.) The VE indicated that his testimony was consistent with the Dictionary of Occupational Titles ("DOT") except for the sit-stand options. (Tr. at 57-58.)

### F.    Analysis and Conclusions

### 1.    Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, he possessed the residual functional capacity to perform a limited range of sedentary work. (Tr. at 23-31.) Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting and carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a)(1991). Social Security Ruling 83-10 clarifies this definition:

> "Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.

SSR 83-10.

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

##### 2.    Substantial Evidence

Plaintiff contends that substantial evidence fails to support the findings of the Commissioner. (Doc. 14.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Plaintiff specifically contends that the ALJ made an erroneous credibility determination based on his own lay opinion (Doc. 14 at 8), that the ALJ improperly substituted his own opinion for the treating physicians, Dr. Copeland and Dr. Potnis (*id*. at 9, 13), that the ALJ improperly dismissed the limitations of Plaintiff's depression because Plaintiff did not seek regular treatment (*id*. at 12), that the ALJ failed to properly account for Plaintiff's mental impairments (*id*. at 20), that the ALJ failed to indicate how limiting work to simple routine tasks properly accounts for Plaintiff's moderate deficiencies in concentration, persistence or pace (*id*. at 15), and that the ALJ failed to meet the burden at step five in determining if the VE's testimony was consistent with the DOT because the "VE merely testified there was a conflict with the DOT . . . [and] did not supply any evidence showing whether he has experience with placing people into such positions or what type of market research was conducted that led to his conclusion that these jobs would allow for a sit/stand option . . . ." (Doc. 14 at 18.)

##### a.    Credibility Determination

Plaintiff contends that the ALJ made an erroneous credibility determination based on his own lay opinion. (Doc. 14 at 8.)

When a disability determination that would be fully favorable to a claimant cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health and Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). When weighing credibility, an ALJ may give less weight to the testimony of interested witnesses. *Cummins v. Schweiker*, 670 F.2d 81, 84 (7th Cir. 1982) ("a trier of fact is not required to ignore incentives in resolving issues of credibility"); *Krupa v. Comm'r of Soc. Sec.*, No. 98-3070, 1999 WL 98645, at *3 (6th Cir. Feb. 11, 1999). However, "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036.

The social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p. In order for pain or other subjective complaints to be considered disabling, there must be (1) objective medical evidence of an underlying medical condition, and (2) objective medical evidence that confirms the severity of the alleged disabling pain arising from that condition, or, objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *See id.*; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986).

17

Therefore, the ALJ must first consider whether an underlying medically determinable physical or mental impairment exists that could reasonably be expected to produce the individual's pain or other symptoms. Secondly, after an underlying physical or mental impairment is found to exist that could reasonably be expected to produce the claimant's pain or symptoms, the ALJ then determines the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to do basic work activities. *Id.* Although a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," C.F.R. §§ 404.1528(a), 416.929(a), "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded *solely* because they are not substantiated by objective medical evidence." SSR 96-7p, at *1 (emphasis added). Instead, the ALJ must consider the following factors:

(I)      [D]aily activities;

(ii)     The location, duration, frequency, and intensity of . . . pain;

(iii)    Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

*Felisky*, 35 F.3d at 1039-40; SSR 96-7p, at *3. Furthermore, the consistency of the evidence, including a claimant's subjective statements, is relevant in determining a claimant's credibility. 20 C.F.R. § 404.1527(c); SSR 96-7p, at *5.

In the instant case, the ALJ thoroughly considered all the relevant factors and determined that Plaintiff's complaints of disabling impairments were not fully credible. (Tr. at 23-30.)

18

Although Plaintiff had resulting pain from injuries sustained in the snowmobile accident, I suggest that substantial evidence supports the ALJ's findings that the record does not reveal objective medical evidence that could produce such disabling pain.

An MRI of the cervical spine in 2008 showed degenerative changes but the changes were "mild" and "minimal." (Tr. at 213, 237, 258.) At the same time, an MRI of the lumbar spine was "unremarkable" except for some "mild" and "mild-to-moderate" effacement and narrowing. (Tr. at 215, 238-39, 255-56.) Dr. Copeland indicated that although Plaintiff had a "50 percent limited range of motion of his lumbar spine in all directions[,]" there was "no motor or sensory deficit noted" and Plaintiff had "intact symmetric reflexes." (Tr. at 220.) Dr. Copeland also stated that there was "nothing that would indicate to me that surgery would benefit [Plaintiff]" and Dr. Copeland "referred [Plaintiff] to a psychiatrist." (*Id.*)

Although Dr. Potnis placed Plaintiff on a "no work status" in September 2008, he also noted that Plaintiff's strength was consistently 5/5 and made modest recommendations, i.e., that Plaintiff should continue physical therapy and "not . . . overtake medications, [but] only use as we prescribe." (Tr. at 249-70, 321-30, 339, 354-55.) Furthermore, on April 30, 2009, x-rays of the sacroiliac joints were unremarkable on the right and showed "[m]ild degenerative change" on the "left sacroiliac joint." (Tr. at 332.) On August 31, 2009, Dr. Potnis indicated that Plaintiff's upper and lower extremity strength was 5/5, his "[g]ait is stable and comfortable without assistive device," his "[s]traight leg, Spurling and Hoffman negative," his "[l]umbar range to 70 degrees of flexion, 10 to 15 degrees of extension with some myofascial back tenderness," his "[h]ip range [was] motion full and pain free" and his "[c]ervical range with some myofascial discomfort at end range." (Tr. at 328.) On November 24, 2009, Dr. Potnis performed electrodiagnostic studies which revealed right carpal tunnel syndrome but which also showed "no findings to suggest acute left

19

lumbosacral radiculopathy" and there were "no features of myopathy, flexopathy, cervical radiculopathy in the upper right extremity" and there were "[n]o electrodiagnostic features of left myopathy, plexopathy or focal neuropathy in the left lower extremity." (Tr. at 324.)

As to mental impairments, although Ms. Freeland diagnosed depressive disorder after examination, she also noted that Plaintiff's thought processes and thought control were all within normal limits. (Tr. at 274, 280.) Dr. Lombardo also diagnosed depression (major depressive disorder), but stated that "depressive symptoms likely would not significantly impair his ability to function in a job. On the contrary, if he was physically able to work, the depressive symptoms would likely remit with gainful employment. There appears to be no impairment in his ability to interact appropriately with others." (Tr. at 287-88.)

Finally, Plaintiff's own testimony describing his ability to perform daily activities supports the ALJ's findings. Plaintiff indicated that on a typical day, he makes breakfast for his daughter, does laundry, makes coffee, watches television, takes a nap, finishes the laundry, does a "few chores around the house[,]" gets the mail, washes dishes, and does some cleaning. (Tr. at 49-50.) Plaintiff also stated that he grocery shops about every two weeks and goes out for dinner and to the movies. (Tr. at 50-51.) Plaintiff stated that he can lift eight to ten pounds and sit for fifteen to twenty minutes at a time, after which he would need to rotate. (Tr. at 51.) Plaintiff also indicated that he can stand for fifteen to twenty-five minutes at a time. (Tr. at 52.) I therefore suggest that the ALJ's credibility findings are supported by substantial evidence during the relevant time period, i.e., through December 31, 2009.

### b.   Treating Medical Sources

Plaintiff argues that the ALJ improperly substituted his own opinion for the treating physicians, Dr. Copeland and Dr. Potnis. (Doc. 14 at 9, 13.)

## I.      Standards

"Medical opinions are statements from physicians and psychologists or other 'acceptable medical sources' that reflect judgments about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." S.S.R. 06-3p, 2006 WL 2329939, at *2 (2006).

The opinion of a treating physician should be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2). "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. § 404.1527(c)(3). "Moreover, when the physician is a specialist with respect to the medical condition at issue, . . . her opinion is given more weight than that of a non-specialist." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

Since the Commissioner is responsible for determining whether a claimant meets the statutory definition of disability, the ALJ "will not give any special significance to the source of an opinion[, including treating sources], on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section[,]" i.e., whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, residual functional capacity, and application of vocational factors. 20 C.F.R. § 404.1527(d)(3). A "[d]octor's notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the 'opposite of

21

objective medical evidence.' [Thus,] [a]n ALJ is not required to accept the statement as true or to accept as true a physician's opinion based on those assertions." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) (citation omitted). "Otherwise, the hearing would be a useless exercise." *Id.*

"[A] treating physician's assessment may be unreliable because of the bias he or she may bring to the disability evaluation," i.e., he or she "'may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.'" *Id.* at 1073 (quoting *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001)). "Additionally, we have noted that the claimant's regular physician may not appreciate how her patient's case compares to other similar cases, and therefore that a consulting physician's opinion might have the advantages of both impartiality and expertise." *Dixon*, 270 F.3d at 1177. "[O]nce well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight . . . [but] 'is just one more piece of evidence for the administrative law judge to weigh . . . .'" *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (quoting *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006)). Once the treating source is placed on the same level as other medical opinions, the treating source opinion should not be subjected to "greater scrutiny" than the non-treating sources, especially when there are more flagrant inconsistencies in the opinions of the non-treating sources. *Gayheart v. Comm'r of Soc. Sec.*, ___ F.3d ___, 2013 WL 896255, at *13 (6th Cir. 2013).

If the ALJ declines to give controlling weight to a treating source's opinion, then he must use the following factors to determine what weight the treating source opinion should be given: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. These factors

may be applied to all medical opinions, not just treating sources. SSR 06-3p, 2006 WL 2329939, at *3 (2006). However, because of the special status of treating source opinions, where the ALJ "failed to conduct the balancing of factors to determine what weight should be accorded these treating source opinions . . . , [t]his alone constitutes error." *Cole v. Comm'r of Soc. Sec.,* 652 F.3d 653, 660 (6th Cir. 2011) (quoting *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009)).

A physician qualifies as a treating source if the claimant sees the physician "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition." 20 C.F.R. § 404.1502. "Acceptable medical sources" who can be considered treating sources include "licensed or certified psychologists." SSR 06-03p, 2006 WL 2329939, at *1-2 (2006). After treating sources, a "nontreating source, who physically examines the patient 'but does not have, or did not have an ongoing treatment relationship with' the patient, falls next along the continuum." *Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 439 (6th Cir. 2012) (quoting *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007)). "'The opinion of a non-examining physician, on the other hand, 'is entitled to little weight if it is contrary to the opinion of the claimant's treating physician.'" *Adams v. Massanari*, 55 F. App'x 279, 284 (6th Cir. 2003) (quoting *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987)).

"Claimants are entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that

23

weight." S.S.R. 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights." *Cole*, 2011 WL 2745792, at *4. "[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

### ii.    Application

I first suggest that the ALJ's findings are not inconsistent with the medical opinions of Drs. Copeland and Potnis through the date last insured, i.e., December 31, 2009. I further suggest that where the opinions diverge from the ALJ, these opinions are not entitled to any deference because they touch on issues reserved to the Commissioner or they are based soley on Plaintiff's reported subjective descriptions of symptoms.

In 2008, Dr. Copeland indicated that although Plaintiff had a "50 percent limited range of motion of his lumbar spine in all directions[,]" there was "no motor or sensory deficit noted" and Plaintiff had "intact symmetric reflexes." (Tr. at 220.) Dr. Copeland also stated that there was "nothing that would indicate to me that surgery would benefit him" and Dr. Copeland "referred [Plaintiff] to a psychiatrist." (*Id.*)

Although Dr. Potnis placed Plaintiff on a "no work status" in September 2008, the issue of whether Plaintiff has the ability work is an issue reserved to the Commissioner and thus, is not entitled to any deference. 20 C.F.R. § 404.1527(d)(3). Dr. Potnis's underlying observations, however, support the ALJ's findings. Dr. Potnis noted that Plaintiff's strength was consistently 5/5 and his recommendations were modest, i.e., to continue physical therapy and that Plaintiff was to take his medication as prescribed. (Tr. at 249-70, 321-30, 339, 354-55.) On April 30, 2009, x-rays

of Plaintiff's sacroiliac joints were unremarkable on the right and showed "[m]ild degenerative change" on the left. (Tr. at 332.) On August 31, 2009, Dr. Potnis indicated that Plaintiff's upper and lower extremity strength was 5/5, his "[g]ait is stable and comfortable without assistive device[,] his "[s]traight leg, Spurling and Hoffman negative, his "[l]umbar range to 70 degrees of flexion, 10 to 15 degrees of extension with some myofascial back tenderness[,]" his "[h]ip range of motion full and pain free" and his "[c[]ervical range with some myofascial discomfort at end range." (Tr. at 328.)

To the extent that Plaintiff relies on Dr. Potnis's opinion in the Lumbar Spine Residual Functional Capacity form, I note first that this evidence of February 2010 lies outside the relevant time period. (Tr. at 341-44.) However, to the extent that it may be viewed as relating back to Plaintiff's condition before the expiration of his insured status in December 2009, I suggest that it is not entitled to deference because his opinion relies solely on Plaintiff's report that he suffers constant pain. (Tr. at 342.) *See Masters*, 818 F. Supp. at 1067 (an ALJ is not required to accept a physician's opinion based on subjective complaints).[2]

### c.    Mental Impairments

Plaintiff contends that the ALJ improperly dismissed the limitations of Plaintiff's depression because he did not seek regular treatment. (Doc. 14 at 12.) Plaintiff cites the transcript at page 29 and case law holding that a failure to seek treatment may be the result of mental illness rather than evidence that the mental impairments are not severe. (*Id*. at 12.) I suggest that the ALJ did not make any such findings. Instead, the ALJ merely recited the opinions given by Dr. Cremerius and

---

[2]I also note that even evidence after the last insured date supports the ALJ.  On July 20, 2010, Dr. Jilhewar opined that "the physical RFC is sedentary," noting also that Plaintiff did not meet Listing 1.04. (Tr. at 383.)

the agency consultant on page 29. To the extent that Plaintiff relies on one statement found on page 30 of the transcript that Plaintiff "has had minimal treatment for mental impairments[,]" I suggest that this statement is not improper but rather an acceptable reference to the well-established principle that modest treatment is inconsistent with a finding of disability. *See Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1001 (6th Cir. 2011); *Myatt v. Comm'r of Soc. Sec.*, 251 F. App'x 332, 334-35 (6th Cir. 2007). I therefore suggest that the ALJ's findings were not undermined by any improper considerations.

Plaintiff also contends that the ALJ failed to indicate how limiting work to simple routine tasks properly accounts for Plaintiff's moderate deficiencies in concentration, persistence or pace. (Doc. 14 at 15.) The moderate limitation in concentration, persistence or pace was assessed by Dr. Marshall in the Psychiatric Review Technique. (Tr. at 299.) However, Dr. Marshall also completed the Mental RFC Assessment wherein he stated that Plaintiff was not significantly limited in the ability to sustain an ordinary routine, remember locations and work-like procedures, make simple work-related decisions, understand and remember simple work instructions, or carry out short and simple work instructions. (Tr. at 303-04.) Therefore, Dr. Marshall concluded that Plaintiff "[r]etains ability to do rote tasks within physical limitations" and is "[a]ble to follow at least simple calculations[, although c]oncentration difficulties precludes complex-tech tasks." (Tr. at 305.)

Even assuming that Dr. Marshall had resoundingly stated that Plaintiff was moderately limited in concentration, persistence or pace and had not addressed Plaintiff's ability to perform simple, rote tasks, this argument is "not uncommon and the case law resolves it both ways." *Hernandez v. Comm'r of Soc. Sec.*, No. 10-cv-14364, 2011 WL 4407225, at *9 (E.D. Mich. Aug. 30, 2011) (collecting cases). The *Hernandez* court stated that

> a hypothetical simply limiting a claimant to unskilled work may, in some instances,
> fail to capture a claimant's moderate limitation in concentration, persistence, or pace

26

> . . . . However, the Court also finds that there is no bright-line rule requiring remand whenever an ALJ's hypothetical includes a limitation of, for example, "unskilled work" but excludes a moderate limitation in concentration. Rather this Court must look at the record as a whole and determine if substantial evidence supports the ALJ's hypothetical and RFC assessment.

*Id.* at *10 (citations omitted). Looking at the record as a whole, I suggest that the ALJ's findings are supported by substantial evidence.

In the instant case, I suggest that there is no evidence of disabling mental impairments. Ms. Freeland noted that Plaintiff's thought processes and thought control were all within normal limits. (Tr. at 274, 280.) Dr. Lombardo stated that "depressive symptoms likely would not significantly impair his ability to function in a job. On the contrary, if he was physically able to work, the depressive symptoms would likely remit with gainful employment. There appears to be no impairment in his ability to interact appropriately with others." (Tr. at 287-88.) Even evidence after Plaintiff's last insured date fails to show disabling mental impairments. Dr. Cremerius concluded that Plaintiff was mildly restricted in maintaining concentration, persistence and pace, but was not limited at all as to activities of daily living or maintaining social functioning. (Tr. at 347.) Finally, Plaintiff's own testimony describing his ability to perform daily activities supported the ALJ's findings. (Tr. at 49-52.)

I therefore suggest that the record as a whole provides substantial evidence supporting the ALJ's hypothetical and the RFC assessment limiting Plaintiff to simple, routine, and repetitive tasks that do not require any significant decision-making. (Tr. at 56.) *See Infantado v. Astrue*, 263 F. App'x 469, 477 (6th Cir. 2008) (substantial evidence supported ALJ's decision where, although the psychiatrist found "moderate" limitations in the plaintiff's ability to maintain attention and concentration for extended periods, the psychiatrist noted the plaintiff's daily activities and concluded that the plaintiff was capable of performing simple tasks on a sustained basis); *Burnett*

*v. Comm'r of Soc. Sec.*, No. 10-cv-14739, 2012 WL 3870362, at \*7 (E.D. Mich. Sept. 6, 2012) (where physician finding moderate limitations in concentration, persistence and pace also concluded that the plaintiff is able to perform unskilled work, ALJ's reliance on limitation to unskilled work was not improper); *Cummings v. Comm'r of Soc. Sec.*, No. 10-11621, 2011 WL 3958473 (E.D. Mich. Sept. 8, 2011) (ALJ's omission of concentration and pace limitations in the hypothetical was reasonable where doctor who concluded that the plaintiff had "serious concentration and attention difficulties" also found that his "ability to work may not be severely impaired as long as the job does not involve any appreciable amount of contact with people"); *Young v. Comm'r of Soc. Sec.*, No. 10-cv-11329, 2011 WL 2601014 (E.D. Mich. May 23, 2011) (although the plaintiff cited to moderate limitations noted in the assessment, the plaintiff failed to mention that the same assessment also concluded that the plaintiff was capable of unskilled work).

### d.    SSR 00-4p

Plaintiff  argues that the ALJ failed to meet the burden at step five in determining if the VE's testimony was consistent with the DOT because the "VE merely testified there was a conflict with the DOT . . . [and] did not supply any evidence showing whether he has experience with placing people into such positions or what type of market research was conducted that led to his conclusion that these jobs would allow for a sit/stand option . . . ." (Doc. 14 at 18.)

I first suggest that Plaintiff's description of the VE's testimony is inaccurate. After having been asked by the ALJ whether his testimony was consistent with the DOT, the VE did not state the his testimony conflicted with the DOT but rather the VE indicated that his testimony was consistent with the DOT "[o]ther than the sit-stand option issue[.]" (Tr. at 57.) The "DOT does not address the subject of sit/stand options[.]" *Zblewski v. Astrue*, 302 F. App'x 488, 494 (7th Cir. 2008). It would appear that this silence could not stand in conflict with any testimony. Perhaps for

this reason, "it is well established that a VE's testimony that an individual can perform work with a sit/stand option does not conflict with the DOT." *Fitzgerald v. Astrue*, No. 3:10-1222, 2012 WL 6676446, at *16 (M.D. Tenn. Dec. 21, 2012) (collecting cases); *Harris v. Comm'r of Soc. Sec.*, No. 1:11-CV-1290, 2012 WL 4434078, at *4 (N.D. Ohio Sept. 24, 2012); *Kozlowski v. Comm'r of Soc. Sec.*, No. 11-cv-12213, 2012 WL 3472354, at *13 (E.D. Mich. Mar. 14, 2012) (collecting cases).

Even if it could be said that the DOT's silence conflicts with any VE testimony regarding sit/stand options, I suggest that the ALJ satisfied Social Security Ruling 00-4p by simply asking the VE if his testimony is consistent with the DOT. *See Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 375-76 (6th Cir. 2006). Therefore, I suggest that the ALJ was not under any obligation to inquire further into the accuracy of the VE's testimony, especially in light of the fact that Plaintiff's counsel has failed to assert at the hearing that any conflict existed nor has he pointed to any actual conflicts in his current brief. *See Ledford v. Astrue*, 311 F. App'x 746, 757 (6th Cir. 2008) ("Nothing in the applicable Social Security regulations requires an administrative law judge to conduct his or her own investigation into the testimony of a vocational expert to determine its accuracy, especially when the claimant fails to bring any conflict to the attention of the administrative law judge").

### 3.    Conclusion

For all these reasons, after review of the record, I conclude that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decision makers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

29

## III.   <u>REVIEW</u>

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

　　　　　　　　　　　　　　　　s/ *Charles E Binder*
　　　　　　　　　　　　　　　　CHARLES E. BINDER
Dated: April 23, 2013　　　　　United States Magistrate Judge

### <u>CERTIFICATION</u>

I hereby certify that this Report and Recommendation was electronically filed this date, electronically served on Evan Zagoria, William Watkinson, Jr., Frederick Daley, Jr., Jessie Wang-Grimm and William Woodard; and served on District Judge Zatkoff in the traditional manner.

Date:  April 23, 2013　　　　　By　　s/*Jean L. Broucek*
　　　　　　　　　　　　　　　Case Manager to Magistrate Judge Binder